John BUXKEMPER and Sharon Diane Buxkemper, as Legal Representatives of the Estate of Jayson Edward Buxkemper, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1608–V.

United States Court of Federal Claims.

Oct. 4, 1994.

Harvey L. Morton, Lubbock, TX, attorney of record, for petitioner.

David L. Terzian, U.S. Dept. of Justice, Washington, DC, for respondent.

## OPINION

HORN, Judge.

The above-captioned case was filed in the United States Court of Federal Claims,[1] pursuant to the National Vaccine Injury Act, 42 U.S.C. §§ 300aa–1 through 300aa–34 (West 1991) (hereinafter Vaccine Act),[2] on respondent's motion to review the decision of the special master, dated April 7, 1994.

The vaccine, which according to petitioners caused the injury to Jayson Buxkemper, was administered on June 26, 1978 and on September 12, 1978, approximately nine years prior to Jayson Buxkemper's death on February 2, 1988. The special master awarded damages to Jayson "for the pain and suffering as a result of his vaccine-related injury sustained prior to his death." The special master, however, chose to withhold determination of the precise award, pending resolution of whether or not, or in what amounts, attorney's fees and costs should be awarded, due to the restrictions of 42 U.S.C. § 300aa–15(b). The special master appears to have granted petitioners compensation based on an unsupported conclusion that Jayson had suffered a seizure disorder within 72 hours following receipt of his first DPT vaccination. According to the special master, "the injury is presumed to be vaccine related because of its temporal proximity" to the vaccination, for which reason she concluded that "petitioners have met all the statutory requirements for establishing a residual seizure disorder, a compensable injury." The special master, however, also explicitly concluded that Jayson Buxkemper's "death was due to factors unrelated to the vaccine," and "not as a sequela of the residual seizure disorder." Moreover, the special master stated that she "cannot find that Jayson was neurologically normal prior to the administration of the DPT shot." In sum, the special master, while awarding damages for pain and suffering for a vaccine-related injury, pursuant to 42 U.S.C. § 300aa–15(d), chose not to award death benefits to Jayson, pursuant to 42 U.S.C. § 300aa–15(a)(2).

Respondent alleges, in opposition to the special master's decision, that the Vaccine

---

1. Following the enactment of the Court of Federal Claims Technical and Procedural Improvement Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, the United States Claims Court was renamed the United States Court of Federal Claims.

2. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3761; and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(C), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(o)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. VI, § 6601(d)–(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. No. 102–168, tit. II, § 201(c), (d)(1), (h)(2), (3), 105 Stat. 1103, 1104; Oct. 27, 1992, Pub.L. 102–531, tit. III, § 902(b), 106 Stat. 4518; June 10, 1993, Pub.L. No. 103–43, tit. XX, § 2012, 107 Stat. 214; Aug. 10, 1993, Pub.L. 103–66, tit. XIII, § 13632(c), 107 Stat. 646; Dec. 14, 1993, Pub.L. 103–183, tit. VII, § 708, 107 Stat. 2242.

Act does not permit an award of compensation for pain and suffering prior to Jayson's death in a case such as the instant one, in which death was determined by the special master not to be vaccine-related. The respondent argues that John and Sharon Buxkemper were not proper petitioners under 42 U.S.C. § 300aa–11(b)(1)(A) because Jayson had already passed away at the time the petition was filed, and, thus, they were not the legal representatives of a minor or disabled person who had sustained a vaccine-related injury. Otherwise stated, the estate of a person whose death was unrelated to a vaccine administration is not included in the category of proper petitioners. According to respondent, "at the time this petition was filed, John and Sharon Buxkemper were proper petitioners only because they alleged that Jayson's death was vaccine-related." Once the special master determined that Jayson's death was not vaccine-related, however, they no longer were proper petitioners to present a claim under the Vaccine Act.

In response, petitioners assert that respondent's analysis is "an extremely legalistic and strained 'analytical' interpretation of the Vaccine Act" and is "devoid of the public policy considerations which prompted the passage of the Vaccine Act." Petitioners argue that an intervening death should not bar the parents of a vaccine-injured child, subsequently deceased, from receiving compensation under the Act. Moreover, petitioners attempt to buttress their position by relying on Texas laws regarding the survival of causes of action for wrongful death.

## FACTS

The facts relevant to this court's review, for the most part, are undisputed. According to the findings of the special master and the record before the special master, the mother, Sharon Buxkemper, had a difficult pregnancy prior to Jayson's birth. Following his birth on April 24, 1978, Jayson was described as inactive, somewhat cyanotic, with a weak cry, as having difficulty with vomiting, exhibiting tremors, and evidencing stiffening episodes. During the neonatal period, he was described as a very lethargic baby, who slept an unusual amount, who continued to have a vomiting problem and who appeared to be choking a lot. As a result of Jayson's continued health problems, he underwent an upper GI test in June 1978, which, according to the medical records, was reported as a "negative GI."

On June 26, 1978, Jayson received his first DPT vaccination. Apparently, based on testimony of the parents and a friend of the family, the special master found that Jayson reacted to the vaccination within hours, appeared apneic, and his eyes appeared to be rolling back in his head. The parents claim that Jayson had a fever, cried uncontrollably, and exhibited periods of lifelessness for several days. Within two to three days, Jayson was observed to exhibit jerking episodes of the arms and legs and continued rolling of the eyes.

At the age of four and one-half months, on September 12, 1978, Jayson received his second vaccination, although the dosage was reduced by half. Jayson allegedly, based on the same sources, his mother, his father and a friend of the family, reacted again, although more severely, with similar seizures, increasing in severity and number. Jayson never fully recovered and remained completely bedfast. In 1981, Jayson was placed in a full-time care facility at Lubbock State School, with profound mental retardation and an intractable convulsive disorder. The records of his evaluation by the Lubbock State School, dated February 21, 1979, appears in the record. According to the special master, "on February 2, 1988, Jayson died, allegedly of acute and chronic bronchopneumonitis, as the result of aspiration of gastric contents."

On September 26, 1990, John and Sharon Buxkemper, as legal representatives of the estate of their son, Jayson Edward Buxkemper, filed a petition in this court seeking compensation under the National Vaccine Injury Act. Special Master E. LaVon French, to whom the case was assigned, held an evidentiary hearing on March 25, 1994, and rendered a decision from the bench. Later, on April 7, 1994, the special master issued a written opinion, expanding on her earlier ruling from the bench. *Buxkemper v. Sec'y DHHS*, Fed.Cl. No. 90–1608V.

After a thorough review of the record and filings in the above-captioned case, the court concludes that the special master should not have awarded compensation to Jayson Buxkemper for pain and suffering. Based on the record before the court, the court rejects certain of the findings of fact made by the special master, and finds further that Sharon and John Buxkemper are not proper petitioners under the Vaccine Act and are not eligible to seek compensation for a vaccine-related injury following Jayson's death.

## DISCUSSION

When deciding a motion to review a special master's decision, the judges of this court shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

As stated in the legislative history of the Vaccine Act:

The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

(citing H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. at 512–13, 517, reprinted in 1989 U.S.Code Cong. & Admin.News 1906, 3115, 3116, 3120).

Although review by the judges of this court of decisions issued by the special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

Munn v. Sec'y DHHS, 970 F.2d 863, 870 n. 10 (1992). Adopting these guidelines, a judge in the United States Court of Federal Claims case of Cox v. Sec'y DHHS likewise wrote:

Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the 'arbitrary and capricious standard'; legal conclusions under the 'not in accordance with the law standard'; and discretionary rulings under the 'abuse of discretion standard.' See Munn v. Sec'y DHHS, 970 F.2d 863, 870 (Fed.Cir.1992).

Cox v. Sec'y DHHS, 30 Fed.Cl. 136, 142 (1993); see also Perreira v. Sec'y DHHS, 27 Fed.Cl. 29, 31 (1992).

■ The arbitrary and capricious standard of review is a narrow one. Johnston v. Sec'y DHHS, 22 Cl.Ct. 75, 76 (1990); Perreira v. Sec'y DHHS, 27 Fed.Cl. at 32. Pursuant to this standard, the special master's judgment is to be accorded great deference. Skinner v. Sec'y DHHS, 30 Fed.Cl. 402, 408 (1994). In reviewing the special master's holding, this court is not to substitute its own judgment for that of the special master. Skinner v. Sec'y DHHS, 30 Fed.Cl. at 408 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971)). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." Hines v. Sec'y DHHS, 940 F.2d 1518, 1528 (Fed.Cir.1991); Estate of

*Arrowood v. Sec'y DHHS,* 28 Fed.Cl. 453, 457 (1993). As long as the special master has "considered all relevant factors, and has made no clear error of judgment," the decision should stand. *Lonergan v. Sec'y DHHS,* 27 Fed.Cl. 579, 580 (1993).

Although the arbitrary and capricious standard is widely used, there is no uniform definition of this standard. In *Hines v. Sec'y DHHS,* however, the court has accumulated, and offered as guidance, a wide variety of examples in which the arbitrary and capricious standard has been applied:

> 'an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rule making); agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); 'proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations,' *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of preaward bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); 'the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decision-making,' rather

than its actual decision,' *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...' *Mobil Oil Corp. v. Department of Energy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp. Emer.Ct.App.1976)).

*Hines v. Sec'y DHHS,* 940 F.2d at 1527–28.

■ Although findings of fact are reviewed under the arbitrary and capricious standard, questions of statutory construction should be reviewed by the standard of "not in accordance with the law." This court does not agree that legal conclusions of the special master in vaccine cases should be reviewed under the arbitrary and capricious standard, as the court concluded in *Ultimo v. Sec'y DHHS,* 28 Fed.Cl. 148 (1993), or that, otherwise stated, a *de novo* review of statutory construction is inappropriate, as the court concluded in *Skinner v. Sec'y DHHS,* 30 Fed.Cl. at 408. Reviewing the words of a statute differs from reviewing findings of fact made by a special master on the record presented, in which witnesses have offered personal testimony to the special master, and in which credibility determinations and evaluations of the weight of the evidence are critical. This court believes that a judge of this court ought to, and, in any event will, conduct a *de novo* review of the meaning of the words of a statute, of course, within the context of binding case precedent. A review of whether the special master's understanding of the words of the statute was accurate must begin with the fundamentals, the words of the statute. This court believes that it is somewhat fictitious to suggest that a review of statutory construction can be conducted under the arbitrary and capricious standard. Such, also, is the normal course of appellate or quasi-appellate review.

■ The United States Court of Appeals for the Federal Circuit has offered guidance

on how to approach statutory interpretation, as follows:

> Statutory construction requires the application of recognized rules. *See generally Sutherland Statutory Construction* (4th ed.). First, " ' "[t]he starting point in every case involving construction of a statute is the language itself." ' " *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). Second, where a statute states what a term "means" then all other meanings not stated are excluded. *Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979). Third, clear evidence of legislative intent prevails over other principles of statutory construction. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Fourth, absent a very clear legislative intent, the plain meaning will prevail. *Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980). Last, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *National Lead Co. v. United States*, 252 U.S. 140, 146–47, 40 S.Ct. 237, 239, 64 L.Ed. 496 (1920); *Farrell Lines, Inc. v. United States*, 499 F.2d 587, 605, 204 Ct.Cl. 482 (1974); *cf. Pierce v. Underwood*, [487] U.S. [552], 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

*Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Thus, if a statute is plain and unequivocal on its face, there is no need to resort to the legislative history underlying the statute. *Reid v. Department of Commerce*, 793 F.2d 277, 281 (Fed.Cir.1986) (citing *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961), *reh'g denied*, 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70 (1961)). Furthermore, a court should resort to legislative history only if:

> ... a literal interpretation would lead to an incongruous result. For example, if a literal reading of the statute would impute to Congress an irrational purpose, *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purpose of the statute, *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to a result at variance with the policy of the legislation as a whole, *Trustees of Indiana University v. United States*, 618 F.2d 736, 739, 223 Ct.Cl. 88, 94 (1980), then literal interpretation will be eschewed in favor of resort to the legislative history to ascertain the intent of Congress. *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; 2A Sands § 46.07.

*Reid v. Department of Commerce*, 793 F.2d at 281–82. As is more fully discussed below, this court believes that because the Vaccine Act is either unclear or does not address certain of the issues raised in the instant case, resort to the legislative history is appropriate in this case.

Accepted principles of statutory construction also provide that courts must interpret a statute as a whole. *Massachusetts v. Morash*, 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989). To this effect, the Supreme Court has written:

> On numerous occasions we have noted that " ' " '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " ' " *Kelly v. Robinson*, 479 U.S. 36, 43 [107 S.Ct. 353, 357–58, 93 L.Ed.2d 216] (1986), quoting *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 221 [106 S.Ct. 2485, 2493, 91 L.Ed.2d 174] (1986) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 [76 S.Ct. 349, 359, 100 L.Ed. 309] (1956) (in turn quoting *United States v. Heirs of Boisdore*, 8 How. 113, 122 [12 L.Ed. 1009] (1849))).

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987). *See* Sutherland Stat. Const. §§ 46.05, 46.06 (5th ed. 1992). Otherwise stated, courts must " 'give effect, if possible, to every clause and word of a statute,' "

*United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1883)), for " '[t]he cardinal principle of statutory construction is to save and not to destroy.' " *Id.* (quoting *Labor Bd. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937)).

■ Furthermore, in construing a statute, courts should attempt not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless or superfluous. *Boise Cascade Corp. v. United States E.P.A.,* 942 F.2d 1427, 1432 (9th Cir.1991). *See* Sutherland Stat. Const. § 46.06 (5th ed. 1992). The meaning of statutory language depends on context, and a statute should be read as a whole. *King v. Saint Vincent's Hosp.,* 502 U.S. 215, 220–22, 112 S.Ct. 570, 574, 116 L.Ed.2d 578, 586 (1991) (Souter, J.) (citing *Shell Oil Co. v. Iowa Dept. of Revenue,* 488 U.S. 19, 26, 109 S.Ct. 278, 282, 102 L.Ed.2d 186 (1988)). As stated in *King v. Saint Vincent's Hosp.,* "[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.,* 502 U.S. at 221, 112 S.Ct. at 574 (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941) (L. Hand, J.)). Therefore, when reviewing the Vaccine Act, this court must construe each section in connection with all the other sections, so as to produce a harmonious whole. Moreover, common sense requires that the same words used twice in the same act should have the same meaning. *See* Sutherland Stat. Const. § 46.06 (5th ed. 1992).

In the instant case, the special master concluded that although a vaccine-related death did not occur, Jayson had suffered from a vaccine-related injury, for which he should be entitled to compensation for pain and suffering. In order for the special master's decision to be sustained, the record must demonstrate, by a preponderance of the evidence, that the child, in fact, received a vaccine, as provided in the Vaccine Injury Table,[3] that the alleged injury was one recognized by the Vaccine Injury Table, that the onset of the alleged injury occurred within the specified statutory time limit,[4] that the compensation awarded is appropriate pursuant to the statute[5] and that the petitioners who have brought the lawsuit are proper petitioners under the statute.[6] Petitioners also bear the burden of demonstrating that there is "not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." 42 U.S.C. § 300aa–13(a)(1)(A)–(B). Under the preponderance of the evidence standard, the special master must "believe that the existence of a fact is more probable than its nonexistence, before [the special master] may find in favor

---

**3.** 42 U.S.C. § 300aa–11(c)(1)(A) states that the petitioner must have: "received a vaccine set forth in the Vaccine Injury Table or, if such person did not receive such a vaccine, contracted polio, directly or indirectly, from another person who received an oral polio vaccine ...".

42 U.S.C. § 300aa–11(c)(1)(B)–(D) states:

(B)(i) if such person received a vaccine set forth in the Vaccine Injury Table–

   (I) received the vaccine in the United States or in its trust territories ...,

(C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine ... or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury or condition or the death occurred within the time period after

vaccine administration set forth in the Vaccine Injury Table ...

   (D)(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1,000, or (ii) died from the administration of the vaccine, and

   (E) has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death....

42 U.S.C. § 300aa–13(a)(2) explains the factors unrelated to the administration of the vaccine.

**4.** 42 U.S.C. § 300aa–14.

**5.** 42 U.S.C. § 300aa–15.

**6.** 42 U.S.C. § 300aa–11(b)(1)(A).

of the party who has the burden to persuade the [special master] of the fact's existence." *Ciotoli v. Sec'y DHHS,* 18 Cl.Ct. 576, 588 (1989) (quoting *In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)) (quoting F. James Civil Procedure 250–251 (1965)).

This court does not dispute that certain of the statutory requirements specified in the Vaccine Act were met by the petitioners in the instant case, including the following: Jayson received a DPT vaccination, set forth in the injury table, pursuant to 42 U.S.C. § 300aa–aa(c)(1)(A); a residual seizure disorder is, in fact, a recognized injury under the Vaccine Injury Table, pursuant to 42 U.S.C. § 300aa–14(a)(I)(D); Jason received the vaccinations in the United States, pursuant to 42 U.S.C. § 300aa–11(c)(1)(B)(i)(I); Jayson suffered from an illness for more than six months, incurring unreimbursable expenses greater than $1,000, as required by 300aa–11(c)(1)(D); and petitioners have not brought a civil action or received any compensation prior to this petition, pursuant to 42 U.S.C. § 300aa–11(c)(1)(E).

■ The court, however, is concerned about the basis upon which the special master made her finding that the alleged residual seizure disorder occurred within the three day statutory time limitation, as required by 42 U.S.C. § 300aa–14(a)(I)(D) and (b)(2)(B), and that, therefore, the injury was vaccine-related. The symptoms which qualify as a residual seizure disorder are described in 42 U.S.C. § 300aa–14(b)(2). The statute provides that the injured party must not have suffered a seizure or convulsion unaccompanied by a fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine. Also, the first seizure must have occurred within 3 days from the vaccination and 2 or more seizures or convulsions must have occurred within one year of the administration of the vaccine. 42 U.S.C. § 300aa–14(b)(2)(A) & (B).

In support of the petitioner's claim that the alleged injury occurred within 3 days of the administration of the vaccine, the special master relied upon the testimony of Jayson's mother, father, grandmother, and a friend of the family. None of the medical opinions offered derived from contemporaneous medical records or from doctors who attended Jayson within 3 days of the administration of the two vaccinations, or within a short period thereafter.

The Vaccine Act specifies that the special master cannot find eligibility for compensation based solely on the claims of the petitioners. Instead, the findings must be substantiated by "medical records or by medical opinion." 42 U.S.C. § 300aa–13(a). To meet the requirements of the Vaccine Act, petitioners offered the medical opinions of Dr. Hurst, a pediatric neurologist, who had not yet completed his residency in 1978 when Jayson received the vaccinations at issue. Dr. Hurst offered evidence primarily on the cause of death, stating that the three potential causes of death included chronic pulmonary infection, secondary to neurologic disability, and seizures. Consequently, the special master noted that "[t]here is no suggestion in the record that Jayson died as the result of a seizure, and Dr. Hurst did not explain fully the proposed mechanism of death." In his letter, dated October 31, 1990, Dr. Hurst indicated that he based his conclusion on the cause of the alleged vaccine-related injury and that the seizure activity occurred within 72 hours after the first DPT immunization, on the statements of John and Sharon Buxkemper and their family friend, and on the medical history portion of the Lubbock State School evaluation performed on Jayson at age 10 months and dated February 21, 1979. The Lubbock State School evaluation, however, also cites to no contemporaneous medical documentation, and, likewise, from its contents, appears to rely on the medical history provided by the parents.

In the record provided to the special master, petitioners did not provide any medical documentation demonstrating that Jayson was examined by a medical doctor during the 72 hour period following the vaccination, or shortly thereafter, or that an appointment or telephone call was made to a medical professional on Jayson's behalf during that time frame. Not only was there no contemporaneous medical report of a reaction to the first DPT shot, but the first subsequent medical

note in the record, following administration of the vaccination, was for a choking episode about ten days after the vaccination. Jayson's first specific seizure activity was not documented until July 31, 1978, approximately one month after the first DPT shot, and clearly outside of the 72 hour time limitation, although tremors and rigidity were documented in his case before the vaccinations. On July 31, 1978, the medical reports indicate that Jayson "had formula at 11:30, 30 minutes later eyes rolled back in head and quickly jerking for approximately 3 minutes...." The next medical record appears on August 7, 1978, in which doctors reported "no seizures since 7–31–78."

The special master in this action concedes that her decision, which found a vaccine-related injury, was not based on primary medical evidence. In finding that Jayson's alleged residual seizure disorder was vaccine-related, the special master stated that she relied upon Dr. Hurst, who relied on the Lubbock State School report, signed by Dr. Evie Adams, who also appears to have relied on the medical history taken from the petitioner's parents. In her decision, the special master states:

> The medical record does not provide 'primary' (contemporaneous) documentation of the onset of seizures within 72 hours, but as Dr. Hurst notes, a 'secondary' source, a medical history taken several months later, supports petitioners' claim. It states that Jayson suffered his first seizure '2 to 3 days after' his first DPT immunization.

*Buxkemper v. Sec'y DHHS*, Fed.Cl. No. 90–1608V at p. 4, n. 5 (Sp.Mstr. Apr. 7, 1994). These secondary sources, without more, are insufficient to demonstrate that Jayson suffered from an injury within 72 hours of the administration of the DPT vaccine.

■ The special master also stated that:

> The injury is *presumed* to be vaccine related because of its temporal proximity. The court finds that petitioners have met all the statutory requirements for establishing a residual seizure disorder, a compensable injury. *emphasis added.*

*Buxkemper v. Sec'y DHHS*, Fed.Cl. No. 90–1608V at p. 4 (Sp.Mstr. Apr. 7, 1994). In contradiction to her own presumptions, however, the special master then stated:

> The court notes, parenthetically, that neither Dr. Hurst nor Dr. Kohrman [respondent's medical expert] apparently believes that Jayson's seizures were caused by the DPT. Dr. Hurst supports petitioners' claim on legal, not medical, grounds, that is, that the onset of a Table injury first manifested itself within 3 days and there is no documentable alternative cause.

*Id.* at n. 6. Not only is Dr. Hurst's opinion on the legal effect of the presumption incorrect (*see* 42 U.S.C. § 300aa–13(a)(1)(B)), but a finding that the alleged injury was vaccine-related, based solely upon its undocumented "proximity" to the vaccine, when otherwise unsupported by expert medical documentation or opinion, is insufficient to establish a vaccine-related injury under the statute. The United States Court of Appeals for the Federal Circuit has stated that "[w]ithout more, this proximate temporal relationship will not support a finding of causation." *Grant v. Sec'y DHHS*, 956 F.2d 1144, 1148 (1992) (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984)).

Furthermore, the Vaccine Act, 42 U.S.C. § 300aa–13(a)(1), expressly prohibits a special master from finding a table injury "based on the claims of the petitioner alone, unsubstantiated by medical records or by medical opinion." The matters to be considered by the special master in determining whether to award compensation are discussed in 42 U.S.C. § 300aa–13(b)(1). The special master is directed to consider relevant medical and scientific evidence contained in the record, as well as

> (A) any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and

> (B) the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

42 U.S.C. § 300aa–13(b)(1)(A) & (B). This information is not binding, but should be

evaluated based on the entire record and the course of the injury.

The court in *Cucuras v. Sec'y DHHS* stated:

> Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.

*Cucuras v. Sec'y DHHS*, 993 F.2d 1525, 1528 (Fed.Cir.1993).

Moreover, "written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y DHHS*, 28 Fed.Cl. 516, 523 (1993) (quoting *Murphy v. Sec'y DHHS*, 23 Cl.Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed.Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992)). Additionally, "[a] reputable medical or scientific explanation must support [a] logical sequence of cause and effect." *McClendon v. Sec'y DHHS*, 24 Cl.Ct. 329, 344 (1991) (citing *Strother v. Sec'y DHHS*, 18 Cl.Ct. 816, 820 (1989)).

This court agrees with the special master that based on the record presented it is clear that Jayson's death was not vaccine-related. This court, however, finds the record presented to the special master to be insufficient to support a finding that the alleged injury was vaccine-related. The special master in this case, admittedly, did not rely on primary medical evidence. In fact, there was none presented to her. Instead, she relied upon the legal analysis of a medical professional, secondary information on Jayson's medical condition provided by the parents and a family friend, and proceeded to render her own medical determination, based on an inaccurate application of the legal presumptions included in the Vaccine Act. Therefore, the record is inadequate to prove, by a preponderance of evidence, that a Vaccine Injury Table residual seizure disorder occurred during the critical 72 hour period following the administration of the vaccine, as required in 42 U.S.C. § 300aa–13(a)(1)(A) and 42 U.S.C. § 300aa–14.

■ Although there is a presumption of causation in favor of the petitioner, in order to award compensation under the Vaccine Act, the special master must also find that no factor or factors unrelated to the vaccine administration caused the injury, 42 U.S.C. § 300aa–13(a)(1) & (2). *See also Lewis v. Sec'y DHHS*, 26 Cl.Ct. 233, 238–39 (1992); *McClendon v. Sec'y DHHS*, 24 Cl.Ct. 329, 344 (1991). The legislative history indicates that:

> [t]he Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related.... Until such time, [that research provides more definitive information about the incidence of vaccine injury] however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by the other factors.

H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1, at 18 (1986).

Factors unrelated to the administration of the vaccine are explained in 42 U.S.C. § 300aa–13(a)(2), and these factors cannot include any "idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." 42 U.S.C. § 300aa–13(a)(2)(A). The factors, however, may include any evidence that is documented or on record, including trauma such as birth trauma and related anoxia. 42 U.S.C. § 300aa–13(a)(2)(B).

Respondent contends that Jayson's injury was due to trauma at birth and did not result from administration of the vaccine. Contrary to the special master's finding, the evidence on record presented in this case appears to demonstrate that there was a preponderance of evidence presented to the special master that Jayson's death was due to factors unrelated to the vaccine, and that his medical problems were not, initially, caused by the vaccinations he received. The record presented to the special master is

replete with alternative, possible causes for Jayson's condition.

The record before this court establishes the extensive prenatal, birth and infant medical difficulties suffered by Jayson Buxkemper throughout his nine years. Sharon Buxkemper had a difficult pregnancy. She suffered from the flu for the first two months and did not learn of her pregnancy until four months into her gestation. According to documents in the records, during this time, she was being given progesterone shots and other medicines to initiate her period. Jayson was overdue by one month, and about one week prior to giving birth, Sharon was hospitalized with the flu and needed oxygen. When Sharon eventually gave birth, her labor lasted eighteen hours.

The medical reports and notes taken during Jayson's stay at the hospital immediately after birth indicate that he was inactive, somewhat cyanotic, had a weak cry, required stimulation to cry, had difficulty with vomiting, exhibited tremors, and had stiffening episodes when stimulated. The discharge progress report from the doctor noted continued problems with vomiting, tremors, and breathing. Later reports describe him as being "very lethargic," sleeping an unusual amount of time, and having continued difficulty with vomiting. He was observed choking or appearing to choke often. Despite the fact that an upper GI, which was performed at the age of two months, showed no abnormalities, Jayson continued to suffer from continued and similar medical difficulties. Moreover, there was no contemporaneous report of a reaction to the first DPT shot, and the first medical note was for a choking episode about ten days after the vaccination. Jayson's first seizure was not medically documented until one month after his first DPT vaccine.

Furthermore, Dr. Kohrman, the respondent's medical expert, concluded that an EEG performed on Jayson in March 1979 showed a pattern "in the process of changing from the hypsarythmia characteristic of infantile spasms to the slow spike and wave pattern of Lennox Gastaut Syndrome, and that the slow spike and wave pattern follows in 60 percent of patients with infantile spasms." Dr. Kohrman also indicated that ninety percent of patients with infantile spasms are mentally retarded. The respondent's expert further testified that Jayson followed the typical clinical course of patients with Lennox Gastaut Syndrome and ultimately died of Aspiration Pneumonities, not from the effects of the DPT vaccine. This disease and its symptoms are not Vaccine Injury Table reactions to the DPT vaccine. Dr. Kohrman's conclusion is that the seizure disorder that Jayson suffered was a direct result from the asphyxia suffered at birth, as evidenced by the cyanosis, tremors, rigidity, and weak cry during the new born period.

The respondent further argues that under the Vaccine Act, the petitioners in this action were not properly before this court. As stated in 42 U.S.C. § 300aa–11(b)(1)(A), a proper petitioner includes any of the following:

> ... any person who has sustained a vaccine-related injury, the legal representative of such person if such person is a minor or is disabled, or the legal representative of any person who died as the result of the administration of a vaccine set forth in the Vaccine Injury Table....

The issue presented is whether or not Jayson's parents are proper petitioners to bring an action for a vaccine-related injury under the Vaccine Act, once their claim for vaccine-related death benefits is found not to be compensable by the special master and they no longer can qualify as the legal representative of a minor or disabled person once Jayson had died. Otherwise stated, even if the alleged injury could be found to be vaccine-related, are the parent petitioners eligible to receive an award of compensation for the prior pain and suffering of an alleged vaccine-related injury, when death has been determined not to be vaccine-related.

The language of section 42 U.S.C. § 300aa–11(b)(1)(A) offers no specific affirmative or negative guidance as to whether compensation is allowed for a vaccine-related injury to the estate of a child, when a death has occurred which was found to be unrelated to the administration of the vaccine. Based on the language of 42 U.S.C. § 300aa–

11(b)(1)(A), respondent asserts that Jayson's parents were only proper petitioners until the special master concluded that the death was not vaccine-related. After the special master came to the conclusion that Jayson's death was not vaccine-related, the parents were no longer eligible to represent their son under the Act for vaccine-related injuries. To the contrary, petitioners claim that the legislative history and legislative intent of the Vaccine Act supports an award for pain and suffering, despite the lack of a vaccine-related death in the case. Petitioners contend that not to allow compensation in a case such as this, fails to meet the purposes of the Act.

The purposes of the Vaccine Act were expressed during passage of the original statute in 1986, and reaffirmed in the Budget Reconciliation Act of 1989 applying to fiscal year 1990, as follows:

> The Report accompanying the original Act (H.Rept. No. 99–908, 99th Cong., 2d Sess., Sept. 26, 1986) makes clear that the Congress intended a quick, flexible, and streamlined system. That Report called for a compensation procedure that administered awards 'quickly, easily, and with certainty and generosity.' The system was intended to be 'fair, simple, and easy to administer' and 'to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury.'

H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. 509, at 512, U.S.Code Cong. & Admin.News 1989, p. 3115.

In *Vijil v. Sec'y DHHS*, No. 91–1132V, slip op., 1993 WL 177007 (Fed.Cl.Sp.Mstr. May 7, 1993), Special Master George Hastings did an excellent job of analyzing the Vaccine Act and its legislative history in order to determine whether or not a petitioner could receive compensation for both a vaccine-related injury and a vaccine-related death. Although the *Vijil* case differs from the one currently before the court because the victim in that case did die of a vaccine-related injury, and was found eligible for compensation on that basis, the analysis included in the opinion is equally valid for evaluating the instant case. The following portion of Special Master Hastings' opinion in *Vijil v. Sec'y DHHS*, dealing with the statutory usage of the term "injury" vs. the use of the term "death," is particularly useful:

> Initially, I note that throughout the statutory sections governing the Program, Congress quite frequently used the phrase 'a vaccine-related injury or death,' or very similar language; at a few other places, in contrast, reference was made only to a 'vaccine-related injury' or to a 'vaccine related-death.' The fact that Congress so often used the phrase 'vaccine-related injury or death' is of some significance by itself.[fn7] That is, logically, one could argue (as petitioner here seems to do) that the use of the 'or death' language in each place the statute was redundant, since a person who has been killed by something has certainly been 'injured' by it, in one sense of the word 'injury.' Yet Congress' election to use 'injury or death' in most places, but only 'injury' or only 'death' in a few specific provisions, suggests that Congress viewed the two situations as quite distinct for analytical purposes.

> This inference is buttressed by the fact that in those few instances where Congress referred only to an 'injury' or only to a 'death,' a clear intent to treat the two situations differently is apparent. . . .

> . . . Simply put, the inference can be drawn that when Congress intended a provision to apply to situations where the recipient was either alive or dead, the phrase 'injury or death' was used; when Congress intended application only to living persons, the term 'injury' was used; and when Congress intended application only to deceased persons, the term 'death' was used.

> FN7. For example, the phrase 'vaccine-related injury or death,' or substantially similar wording, appears in § 11(a)(1); § 11(a)(2)(A); § 11(a)(3); § 11(a)(4); § 11(a)(5)(A); § 11(a)(5)(B); § 11(a)(6); § 11(a)(7); § 11(a)(8); § 11(a)(9); § 11(c)(1); § 11(c)(1)(E); § 15(a); § 15(b); § 15(e)(2); § 15(f)(2); § 15(i); § 15(j); § 16(a)(1); § 16(c); § 17(a); § 21(c)(1); and a number of other places in the statute.

*Vijil v. Sec'y DHHS*, No. 91–1132V, slip op. at pp. 2–3.

When reading 42 U.S.C. § 300aa–11(b)(1)(A), it is clear that this section addresses "a person who has sustained a *vaccine-related injury* or the legal representative of such person if such person is a minor or is disabled" separately from "the legal representative of any person *who has died* as a result of the administration of a vaccine." The two categories are even separated by the word "or" in section 300aa–11(b)(1)(A). The eligibility determinations for compensation resulting from vaccine-related injuries or vaccine-related deaths clearly are distinguishable in the statute. The first section of 42 U.S.C. § 300aa–11(b)(1)(A) applies to living, vaccine-injured persons, or their legal representatives, versus the second portion of the section, which applies to the legal representatives of those who have died as a result of the administration of a vaccine. Although not directly addressed in the statutory language, this court is persuaded that the conferees, as manifested in the words of the statute and in the legislative history, intended either compensation for individuals who continue to suffer from a vaccine injury and will have to deal with the costs of that injury for the remainder of his/her life, or death benefits, of up to $250,000.00, to the estates of those who have died as a result of a vaccine-related injury.

Jayson Buxkemper fits neither of the compensable categories described immediately above. The special master specifically found that Jayson was not entitled to receive death benefits because his death was not vaccine-related. She also specifically found that Jayson was not entitled to compensation for costs and expenses incurred prior to the date of judgment. Her attempt to craft a way to award damages to the petitioners by awarding them compensation for pain and suffering for a vaccine-related injury has no basis in the language of the Vaccine Act.

Finally, the petitioners attempt to rely upon the survival of wrongful death causes of action as stated in the Texas Civil Practice and Remedies Code Annotated § 71.021 (West 1994). Petitioners argue that state law should control in the absence of a federal statute to the contrary. The United States Court of Federal Claims, however, does not incorporate state laws in their standards. *Van Epps v. Sec'y DHHS*, 26 Cl.Ct. 650, 653 (1992). The Vaccine Act is a federal act. Courts interpreting the Vaccine Act exclusively have applied federal law "developed under the Administrative Procedure Act and the Vaccine Act." *Id.* at 653. Therefore, the determination of who are proper petitioners cannot be based on a state law of procedure.

### CONCLUSION

For all the foregoing reasons, this court finds that the special master's conclusions, which allowed her to award compensation to petitioners for pain and suffering based on an alleged vaccine-related injury, were arbitrary and capricious and not in accordance with law. Although the circumstances leading to Jayson's difficult, short life and untimely death, indeed, are tragic, the provisions of the Vaccine Act do not allow for compensation to these petitioners. Therefore, the respondent's motion for review is granted, the special master's holding is reversed, and this court finds that petitioners are not eligible to receive compensation under the Vaccine Act.

**IT IS SO ORDERED.**