Elizabeth K. **HOLIHAN** and Greg S. Holihan, as legal guardians for Patrick G. Holihan, Petitioners,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,** Respondent.

No. 95–399V.

United States Court of Federal Claims.

Oct. 14, 1999.

Mary Frankhart, Long Beach, California, for petitioners.

Linda Renzi, Department of Justice, Washington, D.C., for respondent.

## OPINION

BUSH, Judge.

### INTRODUCTION

This case is before the court on respondent's motion for review of a special master's award on a petition for compensation brought under the National Childhood Vaccine Injury Act (Vaccine Act or Act), 42 U.S.C. § 300aa–10 *et seq.* (1994).[1] The issue on review is whether the special master's legal interpretation of § 15(a)(3)(B), resulting in an award of lost earnings to the vaccinee, was correct as a matter of law.[2] For the reasons set forth below, the special master's decision is reversed.

### FACTS

The following facts derive from the special master's opinion and are uncontested, unless otherwise noted. Petitioners' son, Patrick Holihan, is a minor child who has sustained vaccine-caused encephalopathy. The record reflects that Patrick suffers from slightly diminished gross motor abilities, so that in areas such as running, ability to catch a ball, and in overall athletic skills, he is well behind the general skill level of his peers. Patrick also suffers from greatly impaired fine motor skills, such that he experiences tremors of his left hand at times and has considerable trouble manipulating a pencil as well as with other similar activities involving complex finger movements. Patrick has significant impairments in several specific areas of cognitive ability, including auditory learning capacity, certain types of memory function and speech.

The record reflects that both of Patrick's parents are college graduates, with his father earning approximately $110,000 annually as a certified public accountant. Inasmuch as the average intelligence quotient (I.Q.) for college graduates is 115, the neuropsychologist testifying on behalf of petitioners (Dr. Moyer) opined that Patrick's parents probably had at least that I.Q. level and Patrick, absent the encephalopathy, might have had an I.Q. at least 20 points higher than his actual measured I.Q. level of 95 (*i.e.,* an I.Q. of at

---

1. When discussed within the text of this opinion, Vaccine Act sections will be referenced without the preceding title number or "300aa."

2. The special master also awarded compensation for past and future medical expenses, as well as for "pain and suffering." These awards were not challenged by respondent and are not at issue here.

least 115).[3] Dr. Lees–Haley, respondent's neuropsychologist, offered a somewhat different projection of Patrick's I.Q. and stated that, absent the encephalopathy, under the theory of 'regression to the mean', one would expect that a child having parents with an I.Q. of 115 would most likely have an I.Q. between 100 and 115. Thus, while the opinions by neuropsychologists for the respective parties differed in their specific projections of Patrick's I.Q., they concurred in the expectation that, absent the vaccine-caused injury, it is likely that Patrick's I.Q. would have been higher than it is. The special master went on to state that Patrick's reduced I.Q., along with certain physical and specific cognitive impairments, constituted deficits which obviously could impair a person's earning capacity. In fact, respondent has conceded that, as a result of Patrick's vaccine-caused injury, it is more probable than not that Patrick's earning capacity will be significantly impaired.[4]

For their part, petitioners have conceded that, despite his physical deficits and specific cognitive deficits, the fact that Patrick's general cognitive abilities are within the average range means that he will likely earn a high school diploma and possibly be able to at least complete a two-year college program. Petitioners also concede that it is also likely that Patrick will be employable as an adult and will be able to earn the average private non-farm worker wage as set forth in § 15(a)(3)(B) of the Vaccine Act.

## STANDARD OF REVIEW

Upon a motion for review of a special master's decision, Section 300aa–12(e)(2) of the Act provides that this court may either:

(A) uphold the findings of fact and conclusions of law ... and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law ... found to be arbitrary, capricious, an abuse of discretion, or other-

wise not in accordance with law and issue its own findings of fact or conclusions of law, or

(C) remand the petition ... for further action in accordance with the court's direction.

The Vaccine Act's standard of review parallels the standard of review utilized in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1994), under which findings of fact receive deferential review under an "arbitrary and capricious" standard; legal conclusions are reviewed under the "not in accordance with law" standard; and discretionary rulings are reviewed for "abuse of discretion." *Munn v. Secretary of HHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992); *Johnson v. Secretary of HHS*, 33 Fed.Cl. 712, 720 (1995), *aff'd*, 99 F.3d 1160 (Fed.Cir. 1996). There is a divergence of opinion within the court over the level of scrutiny appropriate under the "not in accordance with law" standard. Various decisions of this court have held that "not in accordance with law" warrants deferential review of the special master's conclusions whereas others have applied a *de novo* review. *Compare Buxkemper v. Secretary of HHS*, 32 Fed.Cl. 213, 217 (1994) *and Ashe–Cline v. Secretary of HHS*, 30 Fed.Cl. 40, 44 (1993), *with Camery v. HHS*, 42 Fed.Cl. 381, 387 (1998) *and McCarren v. Secretary of HHS*, 40 Fed.Cl. 142, 146 (1997). Still others narrow the difference to provide for *de novo* review of statutory interpretation but allow some deference toward legal conclusions, reversing only for "clear error." *Carraggio v. Secretary of HHS*, 38 Fed.Cl. 211, 217–18 (1997) (citations omitted).

■ The court may not substitute its judgment for that of the special master, *Wagner v. Secretary of HHS*, 37 Fed.Cl. 134, 136 (1997), however it must reverse any determination wherein the special master misinterprets or misapplies the law. *Id.* at 137; *see*

---

3. Patrick's I.Q. measurement of 95 is well within the average range, which spans from 90 to 110.

4. Petitioners have the burden of proof in demonstrating the facts necessary to prove the amount of award by a "preponderance of the evidence." § 13(a)(1)(A). The standard of proof by a pre-

ponderance of evidence requires that the existence of a fact must be shown to be "more probable than not." *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring); *Lewis v. Secretary of HHS*, 26 Cl.Ct. 233, 237 (1992).

*also Goodwin v. Secretary of HHS,* 27 Fed. Cl. 1, *modified on recon.,* 27 Fed.Cl. 374 (1992). In order to determine if the special master has applied the law correctly, the court must first interpret the law. *See Stotts v. Secretary of HHS,* 23 Cl.Ct. 352, 361 (1991) (holding that § 300aa–12(e)(2)(B) authorizes a "thorough, probing and in-depth review ... for the very limited purpose" of determining if legal conclusions are correct). This court concludes that its review of the special master's statutory analysis should be conducted *de novo* to determine if the legal conclusions are properly grounded or rather are "not in accordance with law." The Federal Circuit's jurisprudence supports the proposition that this court's review under the "not in accordance with law" standard is *de novo. See Euken v. Secretary of HHS,* 34 F.3d 1045, 1047 (Fed.Cir.1994); *Saunders v. Secretary of HHS,* 25 F.3d 1031, 1033 (Fed. Cir.1994).

## DISCUSSION

### I. Statutory Interpretation of § 15(a)(3)(B)

Respondent moves this court to review the decision of the special master pursuant to § 12(d). That Patrick was injured within the meaning of the Act and will likely suffer some diminution in his future earning capacity is not questioned. What is at issue is Patrick's eligibility for an award, under § 15(a)(3)(B), for future lost earnings. The special master found in favor of the petitioners and granted a "loss of earnings" award in an amount equal to the average, private non-farm wage, less statutory offsets. Respondent challenges the special master's statutory interpretation, arguing that the special master has misinterpreted § 15(a)(3)(B) and that the proper interpretation requires a conclusion that Patrick is not entitled to an award under § 15(a)(3)(B). Petitioners agree with and support the special master's interpretation.

The disputed statutory provision provides as follows:

§ 300aa–15. Compensation

(a) General rule

Compensation awarded under the Program to a petitioner under section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, shall include the following: ....

(3) * * *

(B) In the case of any person who has sustained a vaccine-related injury before attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded and whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond, compensation after attaining the age of 18 for loss of earnings is determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and average cost of a health insurance policy, as determined by the Secretary.

In granting compensation for lost earnings to petitioners, the special master found that Patrick had suffered an impaired earning capacity within the meaning of the Act and that Patrick's injury was of sufficient severity such that his earning capacity will be impaired at age eighteen and beyond. The special master determined that Patrick's earning capacity will likely be below the level of what he may have been able to earn had he not sustained the encephalopathy. The special master also determined that Patrick will be able to earn the average, private, non-farm wage.

Respondent does not challenge these findings. Instead, respondent challenges the special master's interpretation of § 15(a)(3)(B) and its application to the present case. The special master found that lost earnings must be awarded "*whenever* a vaccine-injured person will likely have substantially impaired earning capacity as an adult, *regardless* of whether that person will still be able to earn as much as the average non-farm wage." *Holihan v. Secretary of HHS,* No. 95–399V, 1999 WL 63954 at *20 (Fed.Cl. Spec.Mstr. Jan. 19, 1999)(emphases added). Respondent, on the other hand, argues that

the statute guarantees a basic level of income based upon the typical wages of a non-farm worker and authorizes compensation only when the vaccine-injured person will not be capable of earning the average non-farm wage. For purposes of this review, the special master's interpretation of § 15(a)(3)(B) is the sole issue before the court.[5]

In his analysis, the special master divides the subsection into three distinct 'parts.' He characterizes these sections as the qualifying criteria, entitlement, and the calculation formula. In the first portion, from the beginning of the text to the word "beyond", the special master concludes that the petitioner must show (1) that he suffered a vaccine-related injury and (2) that he will suffer a diminution in future earnings as a result. *Holihan*, 1999 WL 63954 at *15. In the second portion of the text, the special master interprets the phrase "compensation after attaining the age of 18 for loss of earnings" as a separate statement of entitlement. Finally, the special master interprets the remainder of the section, starting with the word "determined," to be the award amount. Put briefly, petitioners and the special master interpret the section to read: (1) If a petitioner can show impaired future earnings as a result of his injury; (2) he is entitled to compensation; and (3) the amount will be the average non-farm wage. The special master found the respondent's statutory interpretation to be unpersuasive and declared that the petitioners' version was "more straightforward ... and ... more likely represents Congressional intent." *Id.*

 This court acknowledges that the first 'part' denoted by the special master contains qualifying criteria. However, the court agrees with respondent's position that the special master's disparate treatment of the remainder of the sentence is devoid of support, unjustifiable, and contrary to congres-

sional intent. *See Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1468 (Fed.Cir.1997) (plain meaning preferred to narrow, hidden sense derived through exigency and ingenuity); *see also Chisolm v. United States*, 85 Ct.Cl. 199, 19 F.Supp. 274, 277 (1937) (plain, obvious meaning of words of statute must be applied, and strained construction which would distort its meaning cannot be given). While the special master properly starts with the plain language of the statute, he then infers legislative intent from an arbitrary division that is not supported by a plain reading of the text or any extrinsic evidence. After dividing § 15(a)(3)(B) into three parts, the special master concluded that qualifying individuals are entitled to compensation upon reaching a certain age and that the subsection language, starting with "determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector", sets forth the award amount of that compensation. *Holihan*, 1999 WL 63954, at *17. This interpretation of the statute does not rationally flow from the plain statutory language. A statute is to be read as a unified whole, not a collection of disparate clauses. *Weddel v. Secretary of HHS*, 23 F.3d 388, 392 (Fed.Cir.1994) (citations omitted).

Contrary to the special master's interpretation, it is this court's opinion that a plain reading of the entire phrase shows that the average non-farm wage determination establishes "loss of earnings" and not "compensation", such that the full amount would automatically be awarded upon the establishment of an impairment under the terms of the Act. The statutory language does not mandate that qualified vaccinees, *ipso facto*, receive or be paid the total earnings of the average non-farm worker; instead, the language provides that compensation is to be determined or calculated on the basis of average non-farm

---

5. It appears that in the initial proceedings before the special master, petitioners argued yet a third interpretation of the statute: " '[L]oss' of earnings is calculated by subtracting pre-injury earnings potential ... from post-injury estimated earnings. Whatever the difference, the claimant receives that percentage of the statutory formula." Respondent's Feb. 19, 1999 Brief at 9 n.4. On this point, the special master states that his statutory construction concurs with petitioners'

*basic* interpretation of the statute with a difference merely in the amount of compensation. Inasmuch as petitioners make no mention of, nor present any argument concerning, a third theory of statutory interpretation in any pleading presented to this court, there is no reason to address this interpretation since petitioners have clearly abandoned the other statutory construction in favor of the interpretation set forth in the special master's opinion.

wage earnings. Thus, the wage of a prototypical non-farm worker does not constitute the award amount, but rather serves to provide a basis for calculating the amount to be awarded. The interpretation urged by the special master ignores the "loss of earnings" provision by requiring a program award of the average gross weekly earnings of private, non-farm workers without any loss of earnings calculation.

■ It is well-settled that no portion of a statute should be deemed superfluous, *Walters*, 519 U.S. at 209–09, 117 S.Ct. 660; *Weddel*, 23 F.3d at 393; yet this is exactly what the special master has effectuated by reading the loss of earnings calculation out of the statute. *See Holihan*, 1999 WL 63954, at *17 (finding that omitting the loss of earnings determination would result in easier administration). Inasmuch as the special master's interpretation ignores or misinterprets a relevant portion of the statute, it is clearly erroneous and must be rejected. *See Walters v. Metropolitan Educ. Enter.*, 519 U.S. 202, 209–09, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) ("[S]tatutes must be interpreted, if possible, to give each word some operative effect").

■ In addition to reflecting the plain meaning of the disputed provision, respondent's statutory interpretation is supported by the legislative history of § 300aa–15 and the Vaccine Act, generally. The House Committee Report that adopted the final and current language of the statute also provided a "Section by Section Analysis and Discussion" that set forth how the program was to function. H.R.Rep. No. 99–908, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6362.[6] This report clearly states that "[i]f the earning capacity of the injured person is determined to be impaired, the award is to be adjusted to include *lost earnings up to* the

level of the average weekly earnings of workers in the private, non-farm sector, with appropriate offsets." H.R.Rep. No. 99–908, at 21 (emphasis added). Moreover, the Congressional Budget Office estimate, reprinted in the Committee Report, based its outlay estimates on compensation that includes "actual and anticipated lost earnings", H.R.Rep. No. 99–908, at 38, and further notes that "[E]stimates for lost earnings are based on projected average gross weekly earnings ... as specified in the bill." H.R.Rep. No. 99–908, at 39. Thus, the Committee Report interpreting the Act makes it clear that Congress intended the awards to vary in amount, reflect "lost earnings", and use the average non-farm wage as a benchmark. In so doing, the statute ensures that all vaccine-injured individuals enjoy a basic level of income.

Case law also supports respondent's interpretation of the disputed statutory provision. Respondent cites to decisions rendered by two other special masters that adopted the same statutory interpretation. *Brown v. Secretary of HHS*, No. 88–24V, 1989 WL 250117 (Cl.Ct.Spec.Mstr. Sept. 13, 1989), *aff'd*, 18 Cl.Ct. 834 (1989) *rev'd in part on other grounds*, 920 F.2d 918 (Fed.Cir.1990); and *Wasson v. Secretary of HHS*, No. 90–208V, 1991 WL 20077 (Cl.Ct.Spec.Mstr. Jan. 10, 1991). While the special master agreed that the two cases upheld respondent's interpretation of the statute, he attempted to distinguish these decisions by noting that the special masters in *Brown* and *Wasson* did not articulate their reasoning. Contrary to this reading, however, the *Brown* and *Wasson* decisions are not completely bereft of analysis and do show how the special masters applied the statute to each petitioner's claim: In *Brown*, the special master found that Brown did not prove that she could not earn $16, 763 per year, the average gross weekly earnings of workers in the private non-farm

---

6. It should be noted that the proposed statutory language of Section 2115(a)(3)(B) of H.R. 5546, 99th Cong. (1986), is identical to the current statutory language and the subcommittee urged adoption of the language contained therein; where a subcommittee comments on proposed language and passes it unchanged, it deserves additional weight. *Cf. Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (stating that the "authoritative source for

finding the Legislature's intent lies in the Committee Reports"); *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)(stating that committee reports "represent[] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation."); *accord United States v. O'Brien*, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (committee reports "more authoritative" than floor comments).

sector; therefore, she was not eligible for a loss of earnings award. *Brown,* 1989 WL 250117, at *15–16. Upon review, the United States Claims Court agreed with the special master that Brown failed to prove entitlement and specifically declined to disturb this finding. *Brown v. Secretary of HHS,* 18 Cl.Ct. 834, 843 n. 12 (1989). In *Wasson,* the special master found that the petitioner would likely not earn the average private non-farm wage but could earn an entry-level wage. *Wasson,* 1991 WL 20077, at *7. The special master in *Wasson* then awarded the "difference between the average non-farm wage and the amount of an entry level position." *Id.* In both cases, the special master applied the statute in the manner urged by respondent. *Brown,* 1989 WL 250117, at *15–16; *Wasson,* 1991 WL 20077, at *7; *see also Riley v. Secretary of HHS,* No. 90–466V, 1991 WL 123583 (Cl.Ct.Spec.Mstr. June 21, 1991) (Opinion authored by the *Wasson* special master which adopts same statutory interpretation), *aff'd,* 1992 WL 892300 (Fed.Cl. Mar. 26, 1992).

While the *Brown* and *Wasson* cases are not binding on this court, *Schwenk v. Secretary of HHS,* 23 Cl.Ct. 287, 294 (1991), *aff'd,* 956 F.2d 1173 (Fed.Cir.1992)(Table), they nonetheless provide a credible and objective basis for respondent's interpretation and clearly support respondent's contention that her interpretation of the statute is the more rational reading, as determined from the plain language of the Act. These cases appear to be the only published decisions that address the precise question at issue in the present case. Petitioners do not point to any authority to the contrary and the special master cites none.

## II. Application of the Doctrine of Sovereign Immunity

■ It is clear that the Vaccine Act constitutes a waiver of sovereign immunity, limited to the extent that the petitioners' circumstances satisfy the requirements of the Act. *See, e.g., Grice v. Secretary of HHS,* 36 Fed.Cl. 114, 120 (1996); *Rooks v. Secretary of HHS,* 35 Fed.Cl. 1, 9 (1996); *Edgar v. Secretary of HHS,* 29 Fed.Cl. 339, 345 (1993). As a limited waiver of sovereign immunity,

this statute must be given a strict and narrow construction. *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *Martin v. Secretary of HHS,* 62 F.3d 1403, 1405 (Fed.Cir.1995). Citing numerous precedents, the special master performed an exhaustive and well-considered analysis of the effect of the waiver of sovereign immunity inherent in the Vaccine Act provision here in question and concluded that:

... the sovereign immunity statutory constructions *are* properly applicable to the statutory interpretation question at issue here. This means that I must "constru[e] ambiguities in favor of immunity." *Lane v. Pena,* 518 U.S. at 192, 116 S.Ct. 2092; *United States v. Williams,* 514 U.S. [527] at 531, [115 S.Ct. 1611, 131 L.Ed.2d 608 (1995)]; see also *Robb v. United States,* 80 F.3d 884, 887 (4th Cir.1996) ("all ambiguities are resolved in favor of the sovereign"); *Levernier Construction,* 947 F.2d at 503 (the statutory provision is to be given the "most restrictive" interpretation). It means that if there exist more than one "plausible" reading of the statutory provision at issue (*Nordic Village,* 503 U.S. at 36–37, 112 S.Ct. 1011), or two possible interpretations of "equal likelihood" (*Department of Energy v. Ohio,* 503 U.S. [607] at 626 fn. 16, [112 S.Ct. 1627, 118 L.Ed.2d 255] (1992)), then I must choose the interpretation that produces the more limited award.

*Holihan,* 1999 WL 63954, at *15.

Thus, in accordance with the special master's analysis, under the doctrine of sovereign immunity, two conclusions follow from its application: (1) ambiguities must be construed in favor of immunity and (2) if there exist more than one 'plausible' reading or two possible interpretations of 'equal likelihood' of § 15(a)(3)(B), the interpretation producing the more limited award must be chosen. This court agrees with the foregoing analysis of the application of the doctrine of sovereign immunity to the issue of statutory interpretation in the present case.

Given the benefit of hindsight, Congress could have drafted the provisions of § 15(a)(3)(B) with greater precision. The special master's opinion, concluded that the respondent's interpretation was not plausible

and that therefore, the statute is not ambiguous. This conclusion was necessary to support his determination that sovereign immunity has been waived in this case, in that an act of Congress is ambiguous, and thus does not waive immunity, if it will bear any "plausible" alternative interpretation. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Under the case law previously discussed, it follows, therefore, that if the petitioners and respondent both advance "plausible" statutory readings, the statute is capable of differing interpretations and the special master's application of the doctrine of sovereign immunity will not lie. *Id.* at 36–37, 112 S.Ct. 1011; *see also Department of the Army v. Federal Labor Relations Auth.*, 56 F.3d 273, 277 (D.C.Cir.1995).

As previously stated, the special master's interpretation of subsection 15(a)(3)(B) was in error since the special master based his conclusions upon a flawed premise. *See supra* Part I. This court also determined that both legislative history and previous special master decisions support respondent's interpretation of the statute. While the special master's and petitioners' reading of the statute is grammatically conceivable and a plausible construction of the statute, it is nonetheless a strained construction, pieced together by the imposition of an artificial division of the subsection. Since this court already has concluded that respondent's interpretation is a plausible one (indeed, it is the more reasonable interpretation), it therefore follows that the literal text of § 15(a)(3)(B) is ambiguous insofar as it could plausibly support both petitioners' and respondent's interpretations.[7]

■ A waiver of sovereign immunity always is to be construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires. Therefore, a limitation of the waiver of sovereign immunity in this case must result in an adoption of respondent's view, *i.e.*, that no award may be made which exceeds actual "lost earnings" and no award is made at all if the claimant can reasonably be expected to earn the wages of the prototypical worker described in the statute. It is undisputed that Patrick is expected to be able to earn at least the average non-farm worker wage as set forth in the Act. Consequently, the doctrine of sovereign immunity precludes this court from extending the scope of the statute to include an award to petitioners under the subsection.

## CONCLUSION

For the reasons cited above, the decision of the special master is **REVERSED** and the special master's award of "lost earnings" to petitioners is **VACATED**. The Clerk shall enter judgment consistent with this Opinion. No costs.

---

7. Further evidence of ambiguity may be deduced from the parties' respective statutory interpretations. In his opinion, the special master found that the petitioners' interpretation "more likely represents the Congressional [sic] intent." Nonetheless, as previously noted in this Opinion, *supra* note 5, the special master did not adopt the petitioner's version *in toto;* rather he concluded that a *third* interpretation, closely based on peti-

tioners', was closest to the congressional design. *Id.* While this revelation played no part in the decision, the fact that three separate participants (petitioners, respondent, and the special master) all examined the statute and came to three different conclusions further supports this court's conclusion that subsection 15(a)(3)(b) is inherently ambiguous.