Linda LEWIS, as Conservator
of Porscha Lewis, Minor,
Petitioner,

v.

SECRETARY of the DEPARTMENT
of HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–1306V.

United States Claims Court.

April 20, 1992.

William Dobreff, Warren, Mich., for petitioner.

Sherrill A. La Prade, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on respondent's motion for review of a special master's award on a petition for compensation brought under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1–300aa–34 (1988), *as amended* by several public laws, codified in 42 U.S.C.A. §§ 300aa–1—300aa–34 (West Supp.1991) (the "Vaccine Act"). The issues upon review are whether the special master applied the proper legal standard in evaluating respondent's claim that "factors unrelated" to the diphtheria, tetanus, pertussis ("DTP") vaccination caused the infant's injuries and whether, assuming that the proper legal standard was applied, the special master's decision was arbitrary and capricious in failing to find that the injuries were due to "factors unrelated" to her DTP vaccinations.

## FACTS

The following facts derive from either the special master's opinion or the record before the special master and are uncontested, unless otherwise noted. Porscha Lewis, daughter of Linda Lewis ("petitioner") and Jerry Lewis, was born on August 27, 1988, at Sinai Hospital, Detroit, Michigan. No significant complications were reported during the prenatal period. Peti-

tioner began treatment for chronic hypertension during her pregnancy, however, and was also treated for upper respiratory and urinary tract infections. After birth Porscha's condition was reported as "stable," and she received Apgar scores between 8 and 9.

According to Porscha's medical records at Mt. Carmel Mercy Hospital, Detroit, Michigan, Porscha received her first DTP vaccination and oral polio vaccine ("OPV") on October 25, 1988, at the age of two months. On December 29, 1988, Porscha returned to Mt. Carmel for a routine checkup and her second DTP and OPV immunizations. The Mt. Carmel records indicate there were "no complaints" with respect to Porscha's health on December 29, 1988.

On January 8, 1989, 10 days after receiving the second set of immunizations, Porscha was brought to the emergency room at Mt. Carmel Hospital with complaints of uncontrollable crying. The NURSING ASSESSMENT portion of the EMERGENCY DEPARTMENT RECORD, based on information from Porscha's father, stated that for the past two weeks, Porscha "appears to startle [and] starts crying," unable to stop. In addition, Porscha was "pulling at her ears and irritable." The EMERGENCY REGISTRATION RECORD number 66538, also dated January 8, 1989, indicates that Porscha was "alert, active [and suffering from] no distress." The section entitled FINAL DIAGNOSIS states, "[W]ell baby. R/O [rule out] seizure disorder."

On January 9, 1989, Porscha was examined by her pediatrician, who scheduled an appointment for an EEG. The pediatrician's records recite statements made by Porscha's father indicating that for the last 10 days Porscha was "having episodes of sporadic 'jerking' described as outstretched arms and enlarged eyes.... These episodes occur 8–10 times [per] day and last for [a] few seconds."

That same day, January 9, 1989, Porscha returned to the Mt. Carmel emergency room because of seizure activity. The Mt.

Carmel Emergency Department Nursing Record, dated January 9, 1989, recorded petitioner's complaint that Porscha's "arms flailed back, locked up, and her eyes rolled back." In addition, the nursing record indicates that Porscha was "crying loudly" and her "eyes rolled around" when she was brought into the emergency room. PART TWO of the nursing record reflects that at 9:35 p.m. Porscha had a seizure witnessed by Dr. Kinsman.

On January 31, 1989, an EEG report and clinical resume were prepared concerning Porscha's seizure activity. The EEG Report states that the EEG recording "is indicative of severe diffuse dysfunction and is highly suggestive of a generalized seizure disorder, with an associated encephalopathy." The subsequent clinical resume signed by Drs. McDonald and Morales indicates that the seizures "may have been precipitated by the DTP." In addition, the clinical resume notes that "[t]here was a note placed in the chart that the child was not to receive the Pertussis on the next series of baby shots but to receive the DT only."

On February 17, 1989, Porscha was admitted to Children's Hospital of Michigan for "evaluation of spasm activity." The medical records at the Children's Hospital of Michigan make several attempts at detailing the history of Porscha's medical problems. At one point the patient history, as detailed by the father, indicates that seizure activity did not begin until one week after the second set of immunizations. The HISTORY SHEET notes:[1]

> After 2 [illegible] set of immunizations ... 1 week later noted baby to have episode where she extended and abducted arms, gradual motion, symmetric movement and slowly arms back to side.

The HISTORY SHEET immediately details another history, however, noting:

> After 2nd set, immediately after shot given, threw hands up, eyes wild. Had fevers, low grade tempo ... 1 week after 2nd set (12/29)....

---

1. This HISTORY SHEET is difficult to decipher given cross-outs and rewrites particularly with respect to the timing of the first seizure activity.

A "Resident Admit Note" [2] dated February 17, 1989, however, states yet a different historical account:

> Porscha was well until two months of age when she developed, slow smooth extension movements of upper extremities followed by slow relaxation. She remains conscious with eyes open and alert. Father related this to her first DTP. After her second DTP she had episodes with quicker extensions and crying. She has had one episode with her eyes rolled up and arms tense lasting one minute with drowsiness afterwards for approximately 2 to 3 minutes.... No prior history of seizure.

On September 13, 1990, petitioner, as conservator of Porscha, filed a petition for compensation under the Vaccine Act. Petitioner alleged that Porscha received a vaccination consisting of pertussis combined with diphtheria and tetanus vaccines on December 29, 1988. Porscha also received a polio vaccine at the same time. Petitioner further alleged that Porscha began suffering the first signs of neurological injuries including an encephalopathy and or seizure disorder within 72 hours of the DTP vaccination. Furthermore, petitioner alleged that Porscha's injury is a compensable table injury as set forth in the Vaccine Act Table. In the alternative, petitioner argues that Porscha's injuries were caused by, or any pre-existing injuries were aggravated, by the pertussis vaccine.

Testifying for petitioner, Dr. Marcel Kinsbourne, an expert pediatric neurologist, opined that the DTP vaccine most likely caused Porscha's disorder. Respondent's expert, Dr. Ihor V. Rak, qualified as an expert in pediatrics, pediatric neurology, and neurophysiology, identified the cause of Porscha's infantile spasms as intrauterine cerebral microdysgenesis, defective development in the main portion of Porscha's brain that occurred *in utero* as a result of hypertension in her mother. Specifically, he thought it more likely than not that the seizure disorder was caused by cerebral microdysgenesis rather than all other causes combined. The experts pointedly disagreed with each other's reading of the medical records and opinions as to causation.

Special Master George L. Hastings, Jr., found that plaintiff was entitled to an award, *Lewis v. Secretary of DHHS*, No. 90–1306V, 1991 WL 262943 (Cl.Ct. Spec.Mstr. Nov. 25, 1991) (*Lewis I*), and thereafter entered a final order fixing the amount of the award. *Lewis*, No. 90–1306V (Cl.Ct.Spec.Mstr. Jan. 8, 1992) (*Lewis II*). At the special master's suggestion, the matter was remanded briefly to allow him to supplement the *Lewis I* opinion to set forth the basis for his rejection of respondent's argument that the infantile spasms from which Porscha indisputably suffers are due to factors unrelated to vaccine administration. The record has been supplemented. *Lewis v. Secretary of DHHS*, No. 90–1306V (Cl.Ct.Spec.Mstr. Mar. 31, 1992) (*Lewis III*).

Respondent's challenges on review focus on the *Lewis I* opinion and *Lewis III* supplement. Respondent argues that the special master erred in *Lewis I*— both factually and legally—in interpreting and applying the evidentiary standard for establishing "factors unrelated to vaccine administration." 42 U.S.C. § 300aa–13(a)(1)(B). The special master found that respondent failed to meet its burden of proving by a preponderance of evidence that Porscha's disorder was due to factors unrelated to vaccine administration, although he considered that respondent's alternative cause was the *"most* likely explanation" for the disorder. ("The most I can say is that if required to point to a single explanation as the *most* likely explanation for Porscha's disorder, based upon the record before me, I would likely select Dr. Rak's theory...." *Lewis I*, slip op. at 8 (emphasis in original)).

The special master reasoned: 1) The statutory presumption that Porscha's disorder was caused by administration of a vaccine was intended to eliminate the need for special masters to resolve extremely difficult questions concerning the likely cause of

---

**2.** The sources used in creating this admittance note are not delineated. It appears, however, that the father provided at least some of the information.

neurological disorders; 2) "Congress generally intended the 'factor unrelated' issue to be [sic] come into play *only* where the record offered clear-cut evidence of a non-vaccine cause....," *id.* at 6 (emphasis in original); and 3) when a Table injury is involved, the statutory presumption makes it "inappropriate ... to weigh the possibility of vaccine-causation against non-vaccine potential causes. Unless the evidence points clearly to a *particular* non-vaccine factor, it would appear that the presumption should remain applicable." *Id.* (emphasis in original).

With respect to *Lewis III,* respondent argues that its medical expert established that the infantile spasms were not idiopathic and, having identified a cause, were due to factors unrelated to vaccine administration.

## DISCUSSION

### 1. *Standard of review*

On review of a decision by a special master, the Claims Court is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C.A. § 300aa–12(e)(2)(B). The issue of whether the evidence of record warrants a conclusion that a vaccine caused an injury calls for review under the arbitrary and capricious standard. *Hines v. Secretarv of DHHS,* 940 F.2d 1518, 1527 (Fed.Cir.1991). According to the Federal Circuit, " '[A]rbitrary and capricious' is a highly deferential standard of review...." *Id.* at 1528.

The Supreme Court, in the context of reviewing a federal agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), explained that under the arbitrary and capricious standard a reviewing court must consider "whether the [federal agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (citing cases) (quoted

in *Hines,* 940 F.2d at 1527). "Although ... [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one...." *Citizens To Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824; *see also Hyundai Elecs. Indus. Co. v. ITC,* 899 F.2d 1204, 1209 (Fed. Cir.1990) (the "touchstone" of arbitrary, capricious, and abuse of discretion standard of review is rationality—consideration of all relevant factors absent a clear error of judgment). In *Hines* the Federal Circuit charted the course for a special master's decision under the arbitrary and capricious standard: It must 1) consider the relevant evidence in the record as a whole; 2) draw plausible inferences from the evidence; and 3) articulate a basis for decision that is rational. *Hines,* 940 F.2d at 1528.

### 2. *Respondent's burden of proof to show alternative causation*

This issue is one of law which is not entitled to deferential review. Section 300aa–13(a) of the Vaccine Act sets forth as a "[g]eneral rule":

(1) Compensation shall be awarded under the Program to a petitioner if the [special master or] court finds on the record as a whole-

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title [including a Vaccine Injury Table condition that manifests itself within 72 hours of vaccine administration and is presumed to have been caused by the administration of a vaccine], and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The [special master or] court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

(2) For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"-

(A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and

(B) may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

In *Grant v. Secretary of DHHS*, 956 F.2d 1144 (Fed.Cir.1992), the Federal Circuit described the "two separate inquiries under the statute":

As a precondition to compensation, the Vaccine Act requires, in addition to a Table Injury or causation in fact, the absence of alternative causes. 42 U.S.C. § 300aa–13(a)(1). A successful showing of legal causation or causation in fact does not end the question. The factfinder must also determine that "there is not a preponderance of the evidence that the … injury … is due to factors unrelated to the administration of the vaccine." *Id.* Moreover this finding must not be "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." *Id.*

The Vaccine Act expressly separates the inquiry for alternative etiologies from the inquiry for causation. These are two separate inquiries under the statute. Thus, the Vaccine Act clarifies that evidence showing an absence of other causes does not meet petitioner's affirmative duty to show actual or legal causation. Moreover, the Act requires a finding on both causation and alternative etiologies. 956 F.2d at 1149–50.

Respondent contends that Porscha suffered from infantile spasms and that they could not have manifested themselves within three days of a DTP vaccination. Dr. Rak testified that Porscha suffered from infantile spasms. In his view the weight of medical opinion is that DTP vaccinations cannot cause infantile spasms. Indeed, a latency period elapses between the beginning of the disorder and the onset of spasms. The length of this period is such that Dr. Rak categorically ruled out infantile spasms as the reactions Porscha manifested within 72 hours of her DTP inoculation. The special master's opinion in *Lewis III* rejected Dr. Rak's theory and respondent's argument because Dr. Rak could not identify the cause of the infantile spasms. However, Dr. Rak did assign a cause, prenatal cerebral microdysgenesis. The court is remanding the case to the special master to reevaluate his findings on alternative causation, which will allow him to explain why or why not Dr. Rak's theory of causation qualifies as idiopathic.

As to the second inquiry, alternative etiologies, the special master postulated, but said that he did not apply, a more stringent standard of proof than a preponderance of the evidence.[3] He also ruled that respondent has the burden of proving a single alternative cause.

The Vaccine Act is clear and unambiguous regarding the quantum of proof itself: The evidence must preponderate that the injury is due to factors unrelated to administration of the vaccine. The standard of proof by a preponderance of evidence requires that the existence of a fact must be shown to be "more probable than not." *In re Winship*, 397 U.S. 358, 371, 90

---

**3.** Indeed, the general Congressional intent to eliminate "causation" controversies in Program cases appears so strong that it seems anomalous that at the same time, Congress made the presumption rebuttable by a mere "preponderance of the evidence" (§ 300aa–13(a)(1)(B)), rather than by some higher standard of proof, such as "clear and convincing evidence." The use of a higher standard would likely have prevented the raising of relatively speculative allegations of "factor unrelated," such as the allegation in this case. Nevertheless, the "preponderance of the evidence" standard obviously does govern this case, and my conclusion remains firm that respondent has failed to establish a "factor unrelated" *even under that standard.*
*Lewis I,* slip op. at 6–7 n. 10.

S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring); *Hines,* 940 F.2d at 1525 (section 300aa–13(a)(1)(A) requires the special master to determine that there is not a preponderance of the evidence showing that the injury was due to factors unrelated to vaccine administration).

Although relentlessly amended, the Vaccine Act presents interpretive problems in almost every case. This is no exception. The special master took two approaches to interpreting the term "factors unrelated." First, he reasoned that Congress intended that compensation not be awarded when "the medical history will plainly identify a non-vaccine agent as the cause...." *Lewis I,* slip op. at 6. "[T]he medical history may clearly show that identification of a causative virus, or that a severe blow to the head occurred ... between the vaccination and the occurrence of neurological symptoms...." *Id.* Second, the special master interpreted the "factors unrelated" term to embody Congress' intention that respondent show that the probability that the putative alternative cause resulted in the injury "is greater than the *combined likelihood of all other potential causes.*" *Id.* at 7 (emphasis in original).

> For instance, if there are two potential causes, and it is 60 percent likely that Factor A caused the injury, while 40 percent likely that Factor B caused it, then there does exist a "preponderance of evidence" that Factor A was the cause. However, if there are three potential causes, and there is a 40 percent likelihood of causation by Factor A, 30 percent likelihood of Factor B, and 30 percent likelihood of Factor C, then there is not a "preponderance" in favor of *any* particular cause.

*Id.* (emphasis in original).

On this basis the special master rejected the weighing of the two parties' proofs to determine which preponderates:

> Thus, in this case, it would be erroneous to merely weigh the likelihood that a prenatal cerebral microdysgenesis caused Porscha's disorder against the likelihood that the DTP vaccination caused it. It is not petitioner's burden to

demonstrate the likelihood of vaccine causation, but *respondent's* burden to show that its suggested cause is more likely in this case *than that of all other potential causes combined.* To use any other test would not give petitioner the benefit of the statutory presumption, and would not require respondent to meet the level of proof required by the plain meaning of the "more probable than not" standard.

*Id.* (emphasis in original).

■ The term "factors unrelated" facially connotes the plural. Although resort to legislative history is unnecessary when a statute is clear and unambiguous on its face, *see Amendola v. Secretary of DHHS,* 23 Cl.Ct. 621, 624 (1991) (citing cases), *appeal docketed,* No. 91–5144 (Fed.Cir. Sept. 3, 1991), it is noted that the legislative history is consistent with the enacted language, which also describes alternative causation as "other, defined illnesses or factors." H.R.Rep. No. 99–908, 99th Cong., 2d Sess., reprinted in 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6359. Thus, the special master incorrectly obligated respondent to adduce clear-cut evidence of a non-vaccine cause. Respondent is not required to prove that its espoused cause is more likely than all other potential causes combined. The Vaccine Act does not contemplate that respondent identify all alternative etiologies and quantify the likelihood of each. Respondent's burden, rather, is to show within the parameters set forth in section 300aa–13(a)(1)(2), that one or more defined non-vaccine-related illnesses or factors more probably than not caused the injury.

Congress put into effect an approach that accords a petitioner a highly preferential presumption of causation. Once a petitioner establishes the basis for the presumption, *i.e.,* the onset of seizures within 72 hours of vaccine administration, respondent can defeat entitlement only by establishing by a preponderance of the evidence that alternative causes precipitated the event. The second inquiry does not displace the presumption; rather, once the presumption is invoked, respondent has the

burden of coming forth with evidence to defeat it. In this case respondent proffered an alternative cause. The Vaccine Act affords respondent the option to do so, but does not require respondent always to denominate one alternative cause. The special master erred in interpreting the Vaccine Act more narrowly than its terms provide. Moreover, the special master posited a stricter burden of proof, and it appears that he evaluated respondent's evidence more exactly than the preponderance standard calls for.

### 3. *Review of the special master's factual analysis*

■ Respondent's case on the facts amounts to a request for a full-dress *de novo* review. Respondent essentially reargues all the evidence in its favor. The Claims Court's review of the facts is not *de novo*. The court's task is to examine whether the special master considered the evidence as a whole, whether he drew plausible inferences from it, and whether the basis for his decision was rational.

■ The special master's evaluation of the evidence can be faulted because the court cannot discern whether the special master would have made the same findings had he applied the correct legal standard, and the special master appears to have applied a stricter standard than preponderance of the evidence. Although the Vaccine Act allows the court to issue its own findings as an alternative to remand, 42 U.S.C.A. § 300aa–12(e)(2)(B), exercising this function would not materially advance the factfinding required under the Act. Congress established a two-tiered review. The Claims Court reviews the special master's findings under the "arbitrary or capricious" standard; the Federal Circuit undertakes an identical review. Appeal of Vaccine Act cases is encouraged. The Act enables review by a petitioner because attorneys' fees are recoverable. Review by the respondent is enabled since foregoing two bites of the apple is resisted rarely. The result is duplicative judicial review and a consequent waste of judicial resources.

The Federal Circuit's opinions on Vaccine Act cases reveal *de novo* reviews of Claims Court decisions, *e.g.*, *Hines*, 940 F.2d at 1524, which means that the special master's decision is reviewed directly, with no particular weight accorded the intermediate review by the Claims Court. *See Grant*, 956 F.2d at 1150 (special master and Claims Court determinations weighed equally). In these circumstances a remand to the special master for additional factfinding dedicates the resources for factfinding at the level where they count: Only the special master can make credibility findings (in this case, for example, the special master was influenced by his perceptions of credibility); some Claims Court judges have invested the special masters with expertise in the Vaccine Act; *see, e.g.*, *Loe v. Secretary of DHHS*, 22 Cl.Ct. 430, 434 (1991); finally, the record can achieve more coherence with one factfinder. The role of the Claims Court would seem to be little other than to assure that the special master discharges his or her task before an appeal is lodged with the Federal Circuit. Given the Act's avowed purposes of expedition and informality, this situation appears incongruous.

### CONCLUSION

Accordingly, based on the foregoing, this case is remanded to the special master with directions to reevaluate the evidence under the correct legal standard and to issue his decision by June 4, 1992. Since the parties may be satisfied with the opinion on remand, the court directs the special master to file his decision accordingly without further intervention of the Claims Court unless either party seeks review. Petitioner shall recover allowable attorneys' fees and costs for the instant review.

IT IS SO ORDERED.